IN RE ESTATE OF JOSEPH C. RHEA.
COURTRIGHT, SIDNER, LEE & GUNDERSON, APPELLANT, V.
ESTATE OF JOSEPH C. RHEA, APPELLEE.

FILED APRIL 6, 1934. No. 28823.

*Courtright, Sidner, Lee & Gunderson, pro se.*

*Abbott, Dunlap & Corbett* and *Cook & Cook, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY and PAINE, JJ., and MEYER, District Judge.

ROSE, J.

In a proceeding in the county court of Dodge county to settle the estate of Joseph C. Rhea, deceased, Courtright, Sidner, Lee and Gunderson, lawyers with offices in Fremont, filed claims for attorneys' fees aggregating $4,000 for their professional services. The county court allowed that amount and made a charge therefor against de-

cedent's estate. From the county court's allowance the heirs of decedent appealed to the district court for Dodge county, where the sum of $3,000 only was allowed. From this reduced allowance Courtright, Sidner, Lee and Gunderson, who will be called "plaintiffs," for convenience, appealed to the supreme court and the heirs of decedent took a cross-appeal from the allowance of $3,000.

Joseph C. Rhea died intestate May 7, 1929, leaving him surviving his widow, Helena T. Rhea, his daughters, Bessie L. Rhea, Hester Ann Hickey, Blanche E. Rhea, Marian R. Rhea, and his son, Mark R. Rhea. These were the only heirs. Live stock belonging to the estate required immediate attention of a special administrator. To serve in that capacity, Henry W. Schoettger was nominated by the heirs and was promptly appointed by the county court. They also engaged plaintiffs as attorneys to perform legal services in the settlement of the estate. The special administrator became the general administrator and acted as such throughout the proceedings. Plaintiffs, under their employment as attorneys, performed services from the time the application for the appointment of a special administrator was prepared by them, shortly after May 7, 1929, until the final account of the general administrator was filed December 28, 1931.

The record contains evidence tending to prove the following facts: For many years intestate had been engaged in buying, raising, feeding and selling live stock. Herds in which he was interested were kept in different pastures and feeding places in the counties of Holt, Rock, Brown, and Washington. Intestate was a member of four different partnerships engaged in his live stock business, but he did not leave records showing specific terms of each partnership or complete accounts of its affairs or of his own transactions. This increased the work of plaintiffs in performing their duties as attorneys. The illness of the widow, who spent part of her time in New York, also increased the difficulties of plaintiffs in obtaining necessary information. Encumbered real estate and leases re-

quired attention. More than 1,300 head of cattle, hogs and mules belonged to the estate. The first appraisement was completed November 25, 1929, and gave the total value of the estate as $143,948.95. A later appraisement contained an estimate exceeding $270,000 as the value of the gross estate. The outstanding liabilities were very large. Among them was a note for approximately $34,000, secured by a chattel mortgage on live stock.

As a witness for plaintiffs, Sidner, a member of their law firm, explained the difficulties encountered in the settlement of the estate, gave details of the services performed, including correspondence by letter, and testified:

"The total amount of the estate or cash handled was $203,587, and real estate $73,300. The appraisal made the gross $276,887. The claims filed against the estate were $79,744.81."

Sidner testified further that plaintiffs devoted 155 days to the performance of their duties; that reasonable compensation was not less than $25 a day; that $5,000 would have been a reasonable allowance for the services performed, though plaintiffs did not claim more than $4,000. In answering hypothetical questions experts generally estimated the value of plaintiffs' services at not less than $25 a day and their opinions of compensation for all services performed varied from $2,500 to $6,000. On testimony of this character and evidence of the arduous duties actually performed, it is insisted that compensation of $4,000 was conclusively established.

Time devoted by an attorney to duties performed for the administrator of decedent's estate at an arbitrary charge for a day's service is not necessarily the measure of compensation allowable by the court. Other factors may enter into the equation. Capable and conscientious counsel are known to vary in skill, accuracy, equipment, diligence and speed.

It is a sensitive judicial function to fix fees of counsel who perform professional services for an administrator and for heirs of a deceased person and to make the al-

lowance a charge against the estate. The administrator and his attorneys are officers of the court and both are fiduciaries in their relation to the heirs. An administrator is a trustee and property of the estate in his hands is trust property. 11 R. C. L. 19, sec. 2. He is both the personal representative of the deceased person and the trustee for the heirs and creditors. 11 R. C. L. 23, sec. 6. An estate in his hands is under the immediate control of the court. 11 R. C. L. 132, sec. 138. The trust estate is of course subject to the legitimate expenses of administration, including proper attorneys' fees, and it is the duty of fiduciaries who take part in the execution of the trust to be diligent in protecting the trust property from fraudulent or excessive claims and misappropriations. This requires services subject to judicial scrutiny and review. Opinions of experts as to the value of services performed by attorneys in the settlement of an estate must be considered on that issue but are not necessarily binding on the court. 2 R. C. L. 1061, sec. 147. The circumstances of each particular case should be considered. 11 R. C. L. 234, sec. 261. In a former opinion it was said:

"In determining what is a reasonable fee, we should take into account the amount of the property involved; the responsibility involved; the questions of law raised, whether intricate and difficult; the time and labor required for performing the services; the result thereof; together with the testimony of experts as to value. When the estate is a large one, honest as well as efficient service is always needed, and something must be paid for it, aside from the amount of labor required." *In re Estate of Thiede,* 102 Neb. 747.

In the proceeding now under consideration complications arose. A brother of intestate sued the administrator for a partnership accounting and pleaded a claim for $25,000. The partnership business involved in that suit had extended over a period of years. Plaintiffs, the attorneys for the administrator, were unable to discover

records or accounts or other evidence essential to a defense to the entire claim or to make a settlement with the claimant. The suit for an accounting was never forced to trial, though pending for a considerable time. Meanwhile, the heirs employed Clark O'Hanlon as special attorney to represent them in the partnership litigation and with his active aid the 25,000-dollar suit was settled for $2,500 within perhaps 90 days. The services of the special attorney were valuable and entered into the final settlement of decedent's estate.

Other complications grew out of protracted controversies over federal estate taxes and federal income taxes. Complete accounts or records of intestate's business and property did not fall into the hands of plaintiffs. Searches for information in different places were required to meet the demands of the revenue department of the federal government. The attorneys' services relating to revenue were performed principally by Gunderson, a member of plaintiffs' law firm. According to his estimate of time, 90 days were devoted to this work. His services were valuable and greatly reduced the claims for federal taxes, but one of his handicaps was the first appraisement of $143,948.95, as the value of the gross estate. This was far below actual value. The effect of the erroneous appraisement, if finally accepted, would have been to lessen the estate tax and to increase the income tax in a greater proportion. There is evidence tending to prove that the appraisers in the first instance made a long trip to a cattle ranch but did not see the cattle there, and that Lee, a member of plaintiffs' law firm, accompanied the appraisers. A new appraisement became necessary and, when made, fixed the value of the gross estate at $276,887, according to Sidner's testimony. Plaintiffs' services relating to income taxes were performed for months with the erroneous appraisement of $143,948.95 a disturbing factor. It may fairly be inferred from the evidence that much of the time devoted to searches for information and to conferences and hearings would have been unnecessary,

had counsel at the beginning insisted on a new appraisement and inquired at the revenue department for the last income tax statement of intestate himself.

The settlement of the estate was further complicated by more serious problems. The administrator was the principal stockholder and also the managing officer of the Arlington State Bank at Arlington, in Washington county. The home of intestate and the offices of plaintiffs were in Dodge county, at Fremont. The administrator, acting for himself, for the bank and for the heirs kept in the bank at times large deposits of trust funds belonging to the estate without charging himself with any interest thereon or any income therefrom. He lent the bank $4,500 belonging to the estate without an order of court or a notice to the heirs. In doing so he failed to exact from the bank a note or a certificate of deposit or any other evidence of the loan, but indicated the transaction by a mere slip of paper and a charge against the bank. He misappropriated about $3,000 of the estate's trust funds and attempted to conceal his lawlessness by means of spurious paper. He took other large sums belonging to the estate and replaced the amount taken with worthless or unsecured notes held by the bank. He furnished his attorneys, plaintiffs, with accounts and data crediting himself with items not lawfully chargeable against the estate. Improper items in his favor were included in the final report of the administrator as first drawn by Sidner. Thereafter interests of the heirs conflicted with claims of the administrator for whom plaintiffs continued to act. The heirs employed Abbott, Dunlap and Corbett as special counsel to represent them in the further proceedings. Special counsel objected to confirmation of the final report as originally drawn. Plaintiffs made no claim against the estate for attorneys' fees for services performed by them after the filing of the final report in the county court, but, as stated, continued to perform services for the administrator. Sidner explained on the witness-stand that he was not a detective; had no knowledge or notice of the

fraud when he prepared the final report as first drawn; reposed confidence in the administrator who had borne a good reputation as a banker with his place of business in another county; relied on his bond to protect the estate; required the administrator to account for all the funds belonging to the estate, including interest and eliminating compensation for the administrator's services. As revised, the final report was confirmed by the county court, leaving nothing open to controversy except the allowance to plaintiffs for their fees. The evidence shows without dispute that plaintiffs are skilful, well equipped lawyers in good standing. There is nothing in the record to challenge their integrity or their good faith or their willingness to perform professional duties. It is clearly shown, however, that the vigilance of the heirs and of the special counsel employed by them at different times exceeded the diligence of plaintiffs in preventing delays, in discovering the fraud of the administrator and in protecting the estate from what otherwise would have resulted in grievous losses.

Ordinarily, services performed by attorneys for the administrator make the employment of special counsel for the heirs unnecessary, but in the present proceedings the situations justified the heirs in employing special counsel on their own initiative and the resulting work was a substantial and valuable part of the settlement of the estate.

The fraud and the lawlessness of Henry W. Schoettger were not services performed by him as administrator but were his individual wrongs. When plaintiffs were misled by Schoettger into inserting in his final account illegal items in his favor, the attorneys' services in that particular were not performed for the administrator in his representative capacity but for the individual whom the county court appointed administrator. The law is that a fee for services by attorneys for an administrator in his individual capacity is not chargeable against the estate of decedent. *McDowell v. First Nat. Bank of Sutton,* 73 Neb. 307; *Goode v. Reynolds,* 208 Ky. 441, 63 A. L. R. 631.

When the evidence is considered from every standpoint in connection with the surrounding circumstances, the district court's allowance of $3,000 for the services performed by plaintiffs for the administrator and the heirs, without regard to the reasons given below, seems to be fair and reasonable compensation. In this view of the controversy over attorneys' fees, plaintiffs are not entitled to have that allowance increased on appeal and the heirs are not entitled to have it reduced on cross-appeal. Affirmed at the costs of plaintiffs.

AFFIRMED.

GOOD, J., dissenting.

I am unable to concur in the majority opinion, not as to any principle of law announced, but I think the facts show that the vast amount of work performed by the attorneys, together with the large amount involved, and the great responsibility entailed, entitled the attorneys to a fee of $4,000, as allowed by the county court.

EBERLY, J., concurs in this dissent.